STATE OF MAINE
ANDROSCOGGIN, ss.

RECEIVED & FILED

MAR 27 2003

ANDROSCOGGIN
SUPERIOR COURT

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-02-05
EAG-AND-3/27/2003

NORMAND ROUSSEAU,
Plaintiff

v.

**ORDER**

DONALD L. GARBRECHT
LAW LIBRARY

MAR 28 2003

CITY OF LEWISTON,
Defendant

## BACKGROUND AND PROCEDURAL HISTORY

This case involves a dispute between the parties concerning the value of Normand Rousseau's interest in a portion of a building known as the Pilsbury Block, located at the corner of Pine and Lisbon Streets in Lewiston. The history of that interest must be reviewed briefly in order to provide a context for this decision. The Pilsbury Block was transferred from Richard LeCompte, Michael Theberge, Thomas Theberge and Andre Dionne to a Maine general partnership known as "Pilsbury Associates" on December 20, 1989. On September 11, 1995, Pilsbury Associates transferred the westerly half of the building to the City of Lewiston for $129,881.58.[1] In the deed describing that transfer, the parties included a provision granting the City a right of first refusal and an option to purchase at fair market value. That option could be exercised at any time within 99 years after September 11, 1995.

At the time the 1995 sale was negotiated, the City and Pilsbury Associates discussed Pilsbury Associates' access to the elevator and stairs. The Purchase and Sale Agreement states that Pilsbury Associates was to "retain certain rights in the elevator and stairway located within the Premises." (Plaintiff H..) However, the Warranty Deed

---

[1] Pilsbury did not actually receive a cash payment. It was released from an obligation to pay a secured promissory note worth approximately $139,881.58, and was required to make four payments of $2,500 to the City. (Plaintiff H.)

signed by the parties did not contain the same provision. The City used the portion of the Block it had acquired to enlarge the public library. As part of its renovation, the City installed elevator access, and then limited use of the elevator to library patrons. That limitation was a source of continuing disagreement between Pilsbury and the City.

On December 3, 1999, Normand Rousseau offered to buy the remainder of the building from Pilsbury Associates for $220,000. Pilsbury Associates notified the City of the offer and, soon thereafter, the City obtained an appraisal of the building. After reviewing that appraisal, the City declined to exercise its right of first refusal. Although Rousseau was then free to purchase the remainder of the building, he opted instead to acquire a long-term lease on the unoccupied space of that portion of the building still owned by Pilsbury Associates. Rousseau testified that he made this decision after consulting with his attorney, Richard Trafton. Mr. Trafton also represented Pilsbury Associates.

That lease, dated January 21, 2000, purported to include all of the Pilsbury Block "... excepting that portion which [Pilsbury Associates] conveyed to the City of Lewiston, by deed dated September 7, 1995 ... and also excepting those portions which are currently leased ...." Included were 1,500 square feet (SF) of the first floor, and all of the second and third floors of the building. The lease indicates that Rousseau obtained rights to approximately 9,920 SF. The term of the lease was thirty years, with two thirty-year renewal options. Rousseau retained the right to terminate the lease at any time; he was required to give only 60 days notice of his intention to do so.

At the time of transfer, Rousseau paid $21,700 to rent the unimproved and vacant space. The lease also required him to pay $350 each month for as long as the space remained unimproved and vacant. However, if Rousseau were to sublease any

2

portion of the space, the rent for the subleased space would increase to $1/SF.[2] Rousseau was also required to maintain at least $100,000 in property insurance and $300,000 in general liability insurance. There is no mention of an elevator or elevator access anywhere in the lease.

In May 2000, the City filed suit against Pilsbury and Rousseau, claiming that the lease constituted a *de facto* conveyance of the property, in violation of the City's right of first refusal. (AND CV-00-96.) With its Answer, Pilsbury included a Counterclaim asserting that the City's library reconstruction had barred its access to the elevator and stairway, thereby substantially impairing its ability to lease or rent the retained premises. It demanded "money damages in an amount equal to the impaired value of the retained premises together with the lost rents [it] would have received if the elevator and stairway had been available."[3] During the remainder of 2000 and the first part of 2001, the City, Pilsbury Associates, and Rousseau attempted to come to an agreement that would result in the City's ownership of Pilsbury's leased fee interest and Rousseau's leasehold estate.

For a variety of reasons, the parties were never able to reach a global agreement. However, as a partial settlement of the litigation discussed above, the City paid Pilsbury Associates $150,055 in October 2001 to cover the cost of purchasing and installing an elevator. Pilsbury never installed an elevator and, as mentioned above, there was no mention of elevator access in its lease with Rousseau.

---

[2] The lease states that: ". . . after a portion or all of the premises are subleased by Lessee, the portion of (or all) of the monthly rent of three hundred fifty dollars ($350) payable from Lessee to Lessor, attributable to the subleased premises, shall increase to one dollar ($1.00) per square foot per year, payable in equal monthly payments as aforesaid, together with that portion of the real estate taxes, utilities, insurance, 'common area maintenance' charges, maintenance and repairs attributable to the subleased premises." The parties have used $.042/SF as the unimproved rental rate.

[3] Pilsbury and Rousseau had reached an agreement on rental terms in the absence of this elevator or stair access.

3

On December 11, 2001, the City took the entire property, including Pilsbury's fee interest and Rousseau's leasehold interest, by eminent domain.[4] At that time, the City paid Pilsbury $50,000 for its interest, and paid Rousseau $95,000 for his. Both Pillsbury and Rousseau challenged those sums by filing actions pursuant to 23 M.R.S.A. § 3029.[5] Those matters were consolidated for hearing.

After the first day of trial, the Pilsbury claim was denied because Pilsbury failed to provide an appraisal of its retained interest. The only appraisal submitted by Pilsbury was an appraisal of the entire fee simple.[6]

The remaining days of this litigation have focused on the continuing dispute between the City and Rousseau about the value of Rousseau's leasehold interest and, specifically, the appropriate method for appraising his interest. In addition, there were

---

[4] In pertinent part, 30 M.R.S.A. §3101 states that:

A municipality may acquire real estate or easements for any public use by using the condemnation procedure for town ways, as provided in Title 23, chapter 304, subject to the following provisions. The limitations set forth in this section do not apply to any taking authorized by any other law.

[5] The pertinent portion of 23 M.R.S.A. §3029 states:

Any person aggrieved by the determination of the damages awarded to owners of property or interests therein under this chapter may, within 60 days after the day of taking, appeal to the Superior Court in the county where the property lies. The court shall determine damages by a verdict of its jury or, if all parties agree, by the court without a jury or by a referee or referees and shall render judgment for just compensation, with interest where such is due, and for costs in favor of the party entitled thereto.

[6] The appraiser retained by Pilsbury Associates found that the value of the entire fee simple was $100,000. That appraisal defines fee simple estate as: "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by governmental powers of taxation, eminent domain, police power, and escheat." At the time the appraisal was done, however, Pilsbury Associates had encumbered its ownership of the building by granting the long-term lease to Rousseau. It no longer held a fee simple in the building.

When asked to review the appraisals done by the other parties, Pilsbury's appraiser noted that Pilsbury's leased fee had virtually no value. Its bargain with Rousseau left it with the "worst of both worlds," i.e., it could not develop the building if the right offer came along, because the building was encumbered by the lease, and it could lose its tenant at any time, with only 60 days notice.

4

multiple delays to allow the parties to obtain appraisals of Rousseau's interest both with and without elevator access. On February 27, 2003, after the last day of the hearing, the court took this matter under advisement. The court has reviewed three appraisals done by George Silver for Rousseau, three done by Mark Plourde for the City, including a correction dated November 7, 2002, and one prepared by Norman Gosline for Pilsbury Associates. In addition, the court has reviewed the various attachments for each of the appraisals, the other documents admitted into evidence, and has taken judicial notice of all documents contained in AND CV-00-96.

As mentioned above, elevator availability and cost is a continuing dispute between Rousseau and the City. That issue will be discussed separately below. With an elevator, in Silver's opinion, Rousseau's interest is worth $220,000; in Plourde's opinion, as amended, Rousseau's interest is worth $119,000. Without an elevator, Silver believes Rousseau's interest is worth $130,000; Plourde believes it is worth $84,000.

All of the appraisals were thorough, well written, and informative. However, for the reasons explained below, the court has adopted the figures presented in Plourde's appraisals.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The building in question is a 3-storey, wood frame and masonry structure. Built in the late 1800s, it was extensively damaged by fire approximately ten years ago. Only the first floor has electrical service or heat. The second and third floors are in extremely rough shape. They have no wall or ceiling finishes, and either nonexistent or heavily damaged floor coverings. Both of the appraisers retained by the parties agreed that significant repairs and renovations would have to be completed before the building could be used for any purpose. Both also agreed that the highest and best use for the

5

building, if renovated, was commercial development by an owner/occupier. A major disagreement was whether the cost of renovation made this development feasible or not. They differed on the cost of renovation itself, and also on the income that renovated office space might generate in downtown Lewiston. A subpart of their disagreement over the income generation figures is based upon their differing visions of the development potential for Lewiston.

Among the standard methods used in valuation of real estate are the market data approach, which is based upon what comparable properties sold for, and the income approach, which is based upon a determination of what the property is producing, or what it is capable of producing in income. Because both Silver and Plourde agreed that the market data approach, using comparable sales, was more appropriate for determining the value of Rousseau's interest, the court will focus on those appraisals. The income approach appraisals will be reviewed more briefly.

Plourde valued Rousseau's leasehold estate by first valuing the entire fee, then deducting the value of Pilsbury's leased fee. His opinion was based upon the premise that the sum of the parts of a fee simple cannot be worth more than the fee itself—the unit value rule. This approach was also used by Norman Gosline in the appraisal he did for Pilsbury Associates.

Silver did not use this approach. He valued the leasehold itself, without reference to the fee simple or to Pilsbury's leased fee. Silver's method might have been appropriate if the taking had occurred after Rousseau had renovated and rented out some or all of the leasehold, because it would then have been possible to use the income approach appraisal. The parties would have been able to use the actual rents paid to Rousseau by his tenants, would have had the actual cost of renovations, and

would have had some concrete information about the "value" of the leasehold estate. With that information, the parties might have been able to consider separately what Pilsbury and Rousseau lost in the taking. However, given the current, unimproved status of the leasehold, and the appraisers' agreement that the cost of renovation is speculative, at best, such an approach is not appropriate.

Although they all intersect, for ease of discussion, each of the issues will be addressed separately.

### A. Elevator

Much of the delay in this case was caused by a dispute over the availability of elevator access for Rousseau. Throughout this litigation, Rousseau has insisted that he has—or would have had, were it not for the taking—the right to use the existing elevator. The evidence simply does not support this assertion. In January 2000, when Rousseau contracted his leasehold interest with Pilsbury Associates, Pilsbury had no access to the elevator. As mentioned above, the City eventually paid Pilsbury approximately $150,000 to allow it to install its own elevator. Although Rousseau may arguably have a claim against Pilsbury Associates if he claims that his lease with it included the right to an elevator, this nebulous claim cannot be included in the appraisal of his leasehold interest as of the date of taking.

When faced with this dilemma, Rousseau availed himself of the Elevator Grant Program. That program, as described in a letter from the City's Development Department, allows property owners to apply for up to $80,000 to offset the cost of elevator installation in the downtown Lewiston area. James Andrews, Director of Community Development for the City, told Rousseau that the Pilsbury Block building was located in the right area for such a grant, but that it did not "meet the priority of

7

installing a common elevator to provide service to an adjacent building." He also pointed out that Rousseau was not the owner of the building, and might not qualify for a grant. (Rousseau J; A-38 – A-39.)

If the court assumes that Rousseau could overcome those problems and obtain an elevator grant, the $80,000 grant would not cover the entire cost of purchasing and installing an elevator. Pilsbury and the City agreed that the cost of installing an elevator would be approximately $150,000. Although Silver included $45,000 as the cost of an elevator in his second appraisal, he conceded at trial that he did not know if that figure included the cost of installation.

The lack of an elevator or elevator access impacts both methods for appraising Rousseau's leasehold interest. It has an obvious impact on the cost of renovation, and therefore on the rents that would have to be charged after the building was renovated. It also plays a role in establishing the comparable sales figures. Acknowledging this, Silver extended his search for comparable sales beyond Maine to include buildings with elevators. (Rousseau J: 58.) He stated that, although overall condition, utility, size and location influenced the ultimate sales process, the primary difference was the availability of elevator access: "The latter dramatically impacted ultimate value." (Rousseau J: 68.)

B. Comparable Sales

In his December 6, 2001 appraisal, Plourde included the extraordinary assumption that there would be elevator and stair access. (City 1: 19.) With that assumption, he reviewed six comparable sales, all of them occurring within two years of the December 2001 taking, and all involving properties on Lisbon Street in Lewiston. After adjusting the sales figures to account for various factors like functional utility and

8

lack of elevator access, he determined that the value of the Pilsbury Block fee simple was $145,000. Using that figure and the income capitalization approach, he then determined that Pilsbury Associates' leased fee estate was worth $50,000, leaving the value of Rousseau's leasehold at $95,000. However, Plourde recently realized that Pilsbury Associates was actually responsible for all expenses except property insurance until the building was renovated. The value of Pilsbury's leased fee, therefore, should only have been $26,000. That would leave Rousseau's leasehold at $119,000, with the extraordinary assumption that Rousseau would have had access to the library's elevator.

When he reviewed the comparables and left out the extraordinary assumption, Plourde's assessment of the fee simple dropped to $110,000 (City 14: 10). Subtracting the corrected figure for the value of Pilsbury's interest, $26,000, leaves the value of Rousseau's leased fee at $84,000.

Silver reviewed a total of twenty comparable sales figures, including one in New York, one in Vermont, four in New Hampshire and one in Portland. Of the twenty, seven sales occurred more than three years before the taking in December 2001, and five occurred more than five years before that date. He eventually made a direct comparison of nine of the selected properties. As discussed above, Silver's report states that the widest difference in values seemed to be directly related to the presence of an elevator.

Silver stated that, using the comparable sales approach with the extraordinary assumption that Rousseau would have access to the existing elevator, his leasehold estate was worth $210,000. (Rousseau I: xxxvii) Using his comparable sales figures, and assuming that the building would have an elevator subsidized by the grant discussed

9

above, Silver still appraised Rousseau's leasehold interest at $210,000. (Rousseau J: xxxiii.) When the elevator was taken out altogether,[7] Silver's comparison of seven sales valued Rousseau's interest at $130,000. Of those seven, six were located in Lewiston, and one was in Auburn. None of the actual sales involved buildings with elevator access.

As noted above, the comparable sale figures used by Plourde are all in the same locale as the Pilsbury Block, and all sales occurred within two years of the taking. For those reasons, the court found these comparable sales figures to be particularly reliable. The figures used by Silver in the "with elevator" appraisals did not have the same "matching" qualities. The court is not willing to assume that the cities of Portland, Maine, Dover and Keene, New Hampshire, and Burlington, Vermont, are similar enough to Lewiston that sales occurring in them during the five years before the taking provide appropriate comparisons.

Even with the elevator out, and with only local sales, a problem remains with Silver's market data approach. All of the comparables he used reflected sales of fee simple estates; Rousseau's interest is only a leasehold. Silver explained that, given the duration of Rousseau's lease, and the amount of space it covered, he believed that the market would react to the leasehold as though it were a fee simple. Based upon that assumption, he adjusted the comparable sales downward by only 5% to reflect the difference in interests. Silver agreed that any institutional lender considering a renovation loan would insist on other collateral, because the leasehold itself would not be sufficient. The leaseholder/tenant's ability to leave the "collateral" at any time on sixty days notice presents a significant problem for any possible developer. Based upon

10

this problem, along with the infrequency with which leasehold estates are sold, the court concludes that Silver's 5% correction is insufficient to distinguish the value of this leasehold interest from the value of a fee simple. For that reason, the court cannot rely upon his opinion of value.

## C. Renovation Costs

Silver testified that the comparable sales approach is the preferred method for determining the value of this property because it shows what is actually going on in the market. He used the income approach as a "check," acknowledging that it involved too many assumptions to be truly reliable. In his report, he stated that the income approach works best when the cash flows of a property can be reliably estimated. (Rousseau K: 41.) That is not the case here.

Plourde testified that the value of Rousseau's leasehold is largely dependent upon the amount of rental income generated. Using renovation figures provided to Rousseau by a local architect, Plourde estimated that creating office space in the building would cost approximately $568,275, exclusive of entrepreneurial incentives and soft costs. If those figures were added in, the renovation cost would rise to approximately $734,309. (City 1: 88-90.) Based upon this figure, and using capitalization rates of 10 and 11%, Plourde found that development of the building was not feasible and that, therefore, the value of the leasehold interest was negligible.

Gosline also shared this view. He testified that, using **either** Silver's renovation costs of $300,000 **or** Plourde's costs of $600,000, it would not be economically feasible to renovate the building and then rent it, given the market then existing.

---

[7] Although the November 13, 2002 transmittal letter indicates that the report has been amended to reflect the absence of elevator facilities, the report still contains two references to a three-stop elevator: page xxv, and page 34.

11

Silver used the same proposed renovation plans (Rousseau J; xxv). However, he apparently started with $370,000 as the cost of renovation (Rousseau J; A-35). When the elevator issue was raised, he added only $45,000 for the cost of installing an elevator. That figure, however, covers only the actual cost of an elevator. It must still be installed. Assuming for the time being that the party developing this building would receive $80,000 as one of the City's elevator grantees, there would still be an additional $70,000 to $98,350 in construction costs associated with the installation of the elevator. (Rousseau I; A-35). If $70,000 is added to Silver's figure of $370,000, the estimated renovation cost increases to $440,000.

Using his $370,000 figure, Silver estimated that one would need to charge rents of $9.50 and $10/SF to support the renovation costs. He then testified that, in Lewiston, rent is "typically" $12/SF, and that this figure would create an economic advantage of $2 to $3/SF, sufficient to support development of the building. Even if no additional cost for elevator renovation is added, however, this formula does not compute. If the rent is $12/SF, and the renovation cost is $9.50/SF, and if Rousseau is required to pay $1/SF to Pilsbury once the building is subleased, that leaves only $1.50/SF economic advantage. If the rent is $12/SF, and the renovation cost is $10/SF, and if Rousseau is required to pay $1/SF to Pilsbury once the building is subleased, that leaves only $1/SF in economic advantage. Silver's opinion that the renovated building could provide sufficient economic advantage was based upon his assumption that there would be $2/SF. In addition, Silver's assessment that this building, once renovated, could command $12/SF in rent is based upon the premise that there would be elevator access.

Once the real cost of an elevator is added, the figures make even less economic sense. With access to the existing elevator, using the income approach, Silver

12

determined the value of Rousseau's interest to be $220,000. (Rousseau I: xxxvii.) When Rousseau would be required to install his own elevator, the value was $210,000. (Rousseau J: xxxiii). When the elevator was removed, and the income approach used, Silver valued Rousseau's estate at $135,000.

Although the court has not adopted either Silver's income approach or Plourde's income approach, the discrepancy in their assessments of the rents that could be charged will still be addressed, as it might have an effect on a potential developer's decision to "buy" Rousseau's leasehold.

## D. Rent

When testifying, Silver stated that the comparable rental figures he used showed a "central tendency" toward $12.50. He had not established either the median or the arithmetic means for his twenty-six comparable figures, asserting that there were too few to be statistically reliable, and provided no explanation for the statement that his comparables showed a "central tendency" toward $12.50. Of the twenty-six comparables cited, only six are higher than $12/SF, and only five are higher than $12.50. Of those six, at least three were all in one building in Auburn that has an attached parking garage, and two others were in a Lewiston building with adjacent parking. In contrast, ten of the comparables fall below $10/SF, Silver's estimated rent cost for renovation. Among those ten are buildings very close to this one on Lisbon Street in Lewiston, without parking. Silver was unable to satisfactorily explain why he discounted the lower figures in reaching his conclusion.

Silver's report also included an assumption that, even without renovation, Rousseau could rent the upper floors for storage. At trial, he agreed that he did not know whether storage was a permitted use in the Centreville zone. It is not. (City 6.)

13

Plourde testified that, despite the recent positive changes in Lewiston's rental market, the rents commanded in December 2001 would not support renovation of the leasehold. He added that rents would only increase if the amount of space available for rent decreased. Plourde noted that, within a block or so of the building, there were 12 or fifteen vacant offices in the former Fleet bank building. Given the continuing glut of office space, he stated that he did not expect any real increase in rents from $10/SF in the near future.

## E. Lewiston Development Potential

Silver testified that the resurgence of development in downtown Lewiston was typical for other Northeast cities, but that growth here has been particularly intensive in the last two or three years. Based upon this, Silver believes that there are very good development opportunities in Lewiston. When questioned, he acknowledged that he could not name a single recent major project in downtown Lewiston that had not been subsidized in some way. He also acknowledged that private market forces in Lewiston were not sufficient to drive development.

Plourde's appraisal of development prospects in Lewiston was less glowing at the time, but in retrospect, particularly prescient:

> Based on the above factors, the future expectations for the local economy is considered to be continued cautious optimism. However, future economic growth of the area will be dependent upon continued economic growth both nationally and regionally, which is now experiencing a recession that reportedly began in March and is anticipated to begin to recover by mid 2002. If the national economy does not recover in 2002 and the national recession lasts much longer than anticipated, this cautious optimism will once again evaporate and this area is likely to return to a period of stagnation at best. Public dollars, which has [sic] sparked much of the recent construction and renovation projects in the area, will begin to evaporate as state and local budgets are squeezed and subsequently new construction and renovation projects will be further limited.

14

(City 1; 38.) The difference in their estimates of Lewiston's growth potential played a small but important part in the way they valued Rousseau's interest. The court finds that Plourde's assessment is more accurate, based upon his personal knowledge of the area.

ORDER

> For all of the reasons explained above, the court finds that the value of Normand Rousseau's leasehold interest in the Pilsbury Block as of December 2001 was $84,000. He has already received an amount in excess of that figure. Therefore, the decision of the City of Lewiston is affirmed.

The clerk is instructed to incorporate this order by reference in the docket for this case.

DATED: 3/27/03

Ellen A. Gorman
Justice, Maine Superior Court

John D Clifford III

Thomas P. Peters II
Plaintiff

Robert Hark
Defendant

15